IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 16, 2005 Session

## LORRIE LISA CROWE v. KYLE ERIC CROWE

**Direct Appeal from the Chancery Court for Weakley County**
**No. 16,869     R. Lee Moore, Jr., Chancellor**

_____

**No. W2003-02864-COA-R3-CV - Filed July 14, 2005**

_____

This appeal arises out of a divorce. The trial court awarded the mother a divorce on the stipulated ground of adultery, named the mother primary residential parent of the parties' youngest child, named the father primary residential parent of the parties' second oldest child by consent of the parties, set child support payments for both parties, divided the marital property, awarded mother alimony *in futuro*, and denied the mother's request for attorney's fees. The mother appeals the denial of her request for attorney's fees, and the father cross-appeals the naming of the mother as the primary residential parent of the parties' youngest child, the child support amount set for the mother, the division of marital property, and the award of alimony *in futuro*. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

L. L. Harrell, Jr., Trenton, TN, for Appellant

Larry Rice, Laura D. Rogers, Memphis, TN, for Appellee

## OPINION

## Facts and Procedural History

Kyle E. Crowe ("Father" or "Appellee") and Lorrie L. Crowe ("Mother" or "Appellant") were married on December 22, 1981, in Gibson County. Father had one previous marriage, and this was Mother's first marriage. The parties had three children of the marriage: Charles Adam Crowe (d.o.b. 2/24/1984) ("Adam"), Kyle Jacob Crowe[1] (d.o.b. 6/7/1986) ("Jacob"), and Sarah Ashley Elisabeth Crowe (d.o.b. 9/3/1991) ("Sarah"). At the time of trial, Mother was forty-two years old and Father was forty-six years old.

During the 1980's, Mother worked as a secretary and as a retail management recruiter. Mother eventually began working independently as a retail management recruiter out of her home. In 1987, Mother obtained her college degree from the University of Tennessee at Martin in secondary education with an emphasis on English. Subsequently, she taught in Brownsville and Union City, Tennessee. In October 1992, Mother was in a plane accident wherein her plane hit a tree while landing at the airport in Obion County. This accident resulted in several injuries to Mother including a broken neck causing paralysis from the chest down, a broken tailbone, and face disfigurement requiring plastic surgery. Since then, Mother has required the insertion of two metal rods along her spinal column and has experienced pressure sores because of her paralysis. She has retained her mobility through the use of a wheelchair and scooter and is able to drive her Dodge Caravan, which is wheelchair accessible. Additionally, Mother is now able to perform most household chores with little difficulty, except for vacuuming and sweeping floors.

After the accident, Mother entered the Cane Creek rehabilitation facility. She worked part-time for Father, performing secretarial functions. Mother also worked part-time as a teacher at an exit-option program in Dresden, Tennessee, in 2000. As of the hearing on November 18, 2002, Mother held a temporary teaching position which had an annual salary of approximately $29,000.00 per year. She requires two courses to make her teaching certificate current.

At the beginning of the marriage, Father attended law school at the University of Memphis, formerly Memphis State University. After completing law school, Father began working for the Hill, Boren & Strickland law firm while Mother worked as a retail management recruiter. Then, for approximately one year, Father worked for another attorney, Jeff Garrety. In the later 1980's, Father joined the United States Marine Corps but was honorably discharged shortly afterward. While Father was in the Marine Corps, Mother, Adam, and Jacob moved in with her parents in Dyer, Tennessee, and when Father was discharged from the Marine Corps, he also lived with Mother's parents for a short time. After moving out of Mother's parents' home, Mother's parents helped the parties purchase a home in Martin, Tennessee. Since 1996, Father has worked on his own as an attorney. The parties stipulated that Father's gross income per month is $20,000.00.

---

[1] The parties entered a consent order naming Father the primary residential parent of Kyle Jacob Crowe.

Father had an affair with a secretary at his office, Amy Turnbow ("Turnbow"), and, as a result, Turnbow and Father have a daughter, Katie, born out of wedlock. Father has no intention of marrying Turnbow, and Turnbow still works for Father. The parties separated in October 2000 when Mother learned of the affair with Turnbow. Mother continued to live in Martin, Tennessee, until about August 2002. At that point in time, she moved to Dyer, Tennessee, with their daughter, Sarah, into a new home, which Mother's father purchased. Though the testimony indicated that Sarah was well-established in Martin, by all accounts, she has also thrived in Dyer, making good grades in school, having many friends including a first cousin, Hope, who is almost Sarah's age, and being involved in cheerleading, softball, and piano.

In November, 2000, Mother filed a complaint for divorce, alleging grounds of irreconcilable differences, inappropriate marital conduct, and adultery. Father filed his answer and counter-complaint, alleging inappropriate marital conduct. After a hearing on the issue of naming a primary residential parent for Sarah, the trial court awarded Mother an absolute divorce based on the stipulated ground of adultery, designated Mother the primary residential parent of Sarah, and designated Father the primary residential parent of Jacob. After hearings on the issues of marital property, alimony, child support, and attorney's fees, the trial court divided the marital property, awarded Mother alimony *in futuro* in the amount of $3,500.00 per month, set Mother's child support obligation at $405.00 per month and Father's child support obligation at $2,100.00 per month, and denied Mother's request for attorney's fees. After the trial court denied both parties' post trial motions, Mother filed an appeal with this Court, presenting the following issue for our review:

> I. Whether the trial court erred when it denied Mother an award of attorney's fees and necessary court expenses.

Father filed a cross-appeal and presents the following issues for our review:

> II. Whether the trial court erred in naming Mother the primary residential parent of Sarah;
> III. Whether the trial court erred in making an equitable distribution of the marital property;
> IV. Whether the trial court erred when it ordered Father to pay Mother alimony *in futuro* in the amount of $3,500.00 per month; and
> V. Whether the trial court erred when it calculated Mother's child support obligation for Jacob.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

**Standard of Review**

This Court has previously articulated the standard by which we review decisions of custody and visitation:

[A] determination of the best residential placement for a child must turn on the particular facts of each case. *Nicely v. Nicely*, No. M2001-02182-COA-R3-CV, 2003, Tenn. App. LEXIS 214, at *12 (Tenn. Ct. App. Mar. 14, 2003). When we review a determination of child custody by a trial court, we are mindful of the following:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *D v. K*, 917 S.W.2d 682, slip op. at 8-9 (Tenn. Ct. App. 1995), *perm. app. denied* (Tenn. Feb. 5, 1996).

*Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996); *see also Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). "Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998) (citations omitted); *see also Adelsperger*, 970 S.W.2d at 485. "[W]e decline to disturb custody decisions unless they are based on a material error of law or the evidence preponderates against them." *Adelsperger*, 970 S.W.2d at 485 (citations omitted).

*Mueller v. Mueller*, No. W2004-00482-COA-R3-CV, 2004 Tenn. App. LEXIS 770, at *8-9 (Tenn. Ct. App. Nov. 17, 2004).

This Court has also previously stated the standard governing our review of child support issues:

> Child support issues are entrusted to the trial court's discretion. *Campanali v. Campanali*, 695 S.W.2d 193, 196 (Tenn. Ct. App. 1985). This discretion is now circumscribed by the child support guidelines promulgated by the Tennessee Department of Human Services pursuant to Tenn. Code Ann. § 36-5-101(e)(2) (1996). These guidelines assist the courts by providing them with rebuttable presumptions with regard to the proper amount of child support based on the payor spouse's income and the number of children to be supported. *Carden v. Carden*, 1995 Tenn. App. LEXIS 751, App. No. 01 A01-9502-CH-00042, 1995 WL 689728, at * 4 (Tenn. Ct. App. Nov. 22, 1995) (No Tenn. R. App. P. 11 application filed); Tenn. Code Ann. § 36-5-101(e)(1); Tenn. Comp. R. & Regs. r. 1240-2-4-.02(7) (1994). We review child support decisions in accordance with Tenn. R. App. P. 13(d), giving the trial court's factual findings, but not its interpretation of the

guidelines, a presumption of correctness. Lumpkins v. Lumpkins, 1995 Tenn. App. LEXIS 651, App. No. 01 A01-9401-CH-00034, 1995 WL 581417, at * 2 (Tenn. Ct. App. Oct. 4, 1995) (No Tenn. R. App. P. 11 application filed).

The guidelines have simplified setting child support by providing formulas for determining child support and by limiting the number of variables in the formula. *Kirchner v. Pritchett*, 1995 Tenn. App. LEXIS 789, App. No. 01 A01-9503-JV-00092, 1995 WL 714279, at * 2 (Tenn. Ct. App. Dec. 6, 1995) (No Tenn. R. App. P. 11 application filed). Since the number of children to be supported is usually evident and undisputed, the most frequently contested variable in the formula is the non-custodial parent's income. *Turner v. Turner*, 919 S.W.2d at 344. In the case of highly compensated individuals, the guidelines permit the courts to consider all the non-custodial parent's income. *Nash v. Mulle*, 846 S.W.2d 803, 806 (Tenn. 1993).

*Turner v. Turner*, No. 01A01-9506-CV-00255, 1997 Tenn. App. LEXIS 219, at *15-16 (Tenn. Ct. App. Mar. 27, 1997).

We review a trial court's division of marital property *de novo* upon the record, affording a presumption of correctness to the trial court's findings of fact. Tenn. R. App. P. 13(d); *Dellinger v. Dellinger*, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997) (citing *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. Ct. App. 1993)). We are mindful that trial courts are given wide discretion by appellate courts with respect to the manner in which they divide marital assets, and, therefore, marital property divisions are given great weight by this Court on appeal. *Dellinger*, 958 S.W.2d at 780 (citing *Wade v.Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994); *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987)).

Because the amount and duration of such alimony awards are affected by the court's findings of fact in consideration of the factors contained in Tenn. Code Ann. § 36-5-101(d)(1), *Vaughn v. Vaughn*, No. E2000-02281-COA-R3-CV, 2001 Tenn. App. LEXIS 572 at *4 (Tenn. Ct. App. Aug. 7, 2001) (citing *Siegel v. Siegel*, No. 02A01-9708-CH-00198, 1999 Tenn. App. LEXIS 139 (Tenn. Ct. App. Mar. 5, 1999)), trial courts have broad discretion regarding the amount and duration of an alimony award. *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994) (citing *Loyd v. Loyd*, 860 S.W.2d 409, 412 (Tenn. Ct. App. 1993); *Jones v. Jones*, 784 S.W.2d 349, 352 (Tenn. Ct. App. 1989)). As such, this Court must uphold an alimony award unless the trial court has abused its discretion. *Vaughn*, 2001 Tenn. App. LEXIS 572, at *4 (citing *Siegel*, 1999 Tenn. App. LEXIS 139 (citing *Hanover v. Hanover*, 775 S.W.2d 612 (Tenn. Ct. App. 1989))). Additionally, an award of attorney's fees is likewise within the discretion of the trial court, and we will not interfere with such an award absent a clear showing of an abuse of discretion. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995) (citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992); *Crouch v. Crouch*, 385 S.W.2d 288, 293 (Tenn. Ct. App. 1964)).

## Custody of Sarah

Father argues that the trial court utilized inappropriate factors in determining that Mother would be Sarah's primary residential parent. Section 36-6-106(a) of the Tennessee Code enumerates several factors a court must consider to make a custody determination:

(a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1)  The love, affection and emotional ties existing between the parents and child;
(2)  The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
(3)  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;
(4)  The stability of the family unit of the parents;
(5)  The mental and physical health of the parents;
(6)  The home, school and community record of the child;
(7)  The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
(8)  Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
>
> (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2001).

In addition to addressing each of the relevant factors in Tenn. Code Ann. § 36-6-106(a). Father raises five arguments contending that the trial court erred when it named Mother primary residential parent of Sarah. First, Father argues that Mother's unilateral decision to move with Sarah to Dyer, Tennessee, should weigh against her being named primary residential parent. It is true that, unless some form of abuse is involved by the other parent, a parent's unilateral relocation with a child evidences that such parent has not contributed to the continuity and stability of the child's environment. Tenn. Code Ann. § 36-6-106(a)(3) (2001). We first note that it appears the trial court considered this unilateral move by Mother as a factor against naming her primary residential parent. In its memorandum opinion, the trial court states that "[it] is troubled that Ms. Crowe would make such a unilateral move without first obtaining permission from the Court." Further, though this act weighs against naming Mother the primary residential parent of Sarah, a trial court must "carefully weigh *numerous* considerations" and not necessarily focus on one factor. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (citing *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988)). Though the trial court did consider and weigh Mother's unilateral move to Dyer, Tennessee, against Mother, it noted that, in terms of continuity and stability, Sarah has spent the bulk of her time before and after the parties' separation with Mother rather than Father, which, the trial court determined, "overcomes any disadvantage created by the move from Martin to Dyer." The evidence supports the finding that Sarah spent more time with Mother than Father, and it appears that the trial court attempted to carefully weigh all the facts concerning the importance of continuity and stability in Sarah's life. Therefore, we cannot say that such a unilateral move in this case requires reversal of the trial court's custody decision.

Next, Father argues that Mother's willingness and stability to facilitate and encourage a continuing relationship between Father and Sarah should also weigh against Mother under the circumstances. Again, while it is true that there was evidence that Mother and Margaret Jewell ("Grandmother"), Sarah's maternal grandmother, criticized Father in front of the children and Mother unilaterally relocated with Sarah to Dyer, Tennessee, this factor only weighs against Mother, it must be considered and weighed among all other relevant factors. We note that it appears the trial court did consider this factor when it disapproved of Mother's unilateral move to Dyer, Tennessee, and admonished Mother, Grandmother, and Father about making any negative statements about the other parent in front of the children. We cannot say that, while this factor may weigh against Mother

and in favor of Father, the trial court erred in its determination that Mother is Sarah's primary residential parent.

Third, Father argues that the trial court improperly utilized a local rule of the court regarding shared parenting and the presence of paramours. However, section 36-6-106(a)(9) requires the trial court to consider the character and behavior of those who live in or frequent the homes of both parents. Tenn. Code Ann. § 36-6-106(a)(9) (2001). For this reason, the trial court did not act improperly when it considered the presence of Father's paramour in determining what is in the best interest of Sarah.

In examining the remaining factors enumerated in Tenn. Code Ann. § 36-6-106(a), the trial court made the following findings. Both Mother and Father love their daughter, Sarah. Both parties provide for Sarah, and, in fact, the trial court noted that both Mother and Father overindulge their children. Father has the capability of earning a substantial income; Mother, with the proper support and maintenance, should also be able to support Sarah. As noted above, the trial court was troubled by the unilateral move by Mother from Martin to Dyer, however, it determined that, because Sarah spent the bulk of her time before and after the separation with Mother, continuity in the child's life favored naming Mother the primary residential parent. Additionally, the trial court found that Sarah is well-adjusted and is as happy in Dyer as she was in Martin. In examining the stability of the parties' family units, the trial court determined that Mother's extended family was more stable. Father's family unit, outside of himself and the parties' two sons, consisted only of Father's mother, who testified that she had moved on several occasions in the past few years. As the trial court notes, this becomes more important considering that Father must devote much of his time to his legal practice. However, Mother's entire extended family lives in Dyer. With the exception of Sarah's maternal grandmother who has a poor temper, all of Mother's relatives who testified appear to be supportive, and Sarah has grown very close to her first cousin, Hope. Except for Mother's disability caused by the plane accident in 1992, both parties are in good health. It appears to be undisputed that Sarah has performed well in school in Dyer and remains involved in several different activities including cheerleading, horseback riding, and piano. Finally, the trial court considered Grandmother's critical nature a negative influence, but also determined that the presence of Amy Turnbow, Father's paramour, is a very negative factor in Sarah's development. Despite Father's fourth argument in his brief that Mother was impeached on several issues, we cannot say that the evidence in the record preponderates against these findings.

Finally, Father argues that the trial court erred in naming Mother the primary residential parent of Sarah because the trial court found it important that Mother and Sarah are both female. Section 36-6-412 of the Tennessee Code states that "[i]t is the legislative intent that the gender of the party seeking to be the primary residential parent shall not give rise to a presumption of parental fitness or cause a presumption in favor of or against such party." Tenn. Code Ann. § 36-6-412 (2001). Though we would admonish the trial court on this issue, after reviewing the record as a whole, we agree that the record supports the trial court's decision designating Mother the primary residential parent of Sarah despite the trial court's reference to the gender of the parties and Sarah. *See Robinson v. Robinson*, No. W2003-01836-COA-R3-CV, 2005 Tenn. App. LEXIS 277, at *61

(Tenn. Ct. App. May 9, 2005). For all of these reasons, we affirm the decision of the trial court naming Mother the primary residential parent of Sarah.

## Marital Property Division

Additionally, Father challenges the property division of the parties' marital estate. Section 36-4-121(c) of the Tennessee Code states what a trial court must consider when equitably dividing marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (2003). The parties agreed that Father would keep possession of his Cadillac and Mother would keep possession of her van, stipulating that each vehicle has an identical value. The parties also agreed that Father would receive title to his motorcycle, which has a value of $6,000.00. Further, the parties agreed that they would each keep the furnishings and appliances currently in their possession and that the value of Mother's furniture and appliances taken from the marital home when she moved to Dyer, Tennessee, exceeds the value of Father's furniture by $7,500.00.

There are only two items[2] aside from the household personal property in the marital

---

[2] In addition to the items discussed in this opinion, there was testimony that Greg Boyd owed the parties $1,500.00 and Lisa Cox owed the parties between $75,000.00 and $100,000.00,

(continued...)

estate. The first is the marital residence of the parties. The trial court determined that the marital home, occupied by Father, holds a fair market value of $255,000.00. Further, the trial court found that the parties have $64,000.00 of equity in the marital home. For this asset, the trial court awarded Mother $50,000.00 of the equity in the marital home. Father was ordered to pay this sum to Mother and, if not, the marital home would be sold and the equity would be divided in the same ratio. The second substantial item of the marital estate was Father's law practice. The trial court, after noting the testimony of Father's accountant that the law firm has $25,000.00 in physical assets, determined that the law firm had outstanding debts in the form of a line of credit, income tax liability, and additional debts totaling $49,000.00, $142,055.00, and $37,866.00 respectively. While the trial court noted that the debts exceeded the physical assets, the law practice was capable of generating a large amount of income each year. The trial court awarded Father his law practice, including all tangible and intangible assets.

In this case, the parties were married for almost nineteen years when Mother filed her complaint for divorce. Mother was forty-two years old and Father was forty-six years old at the time the trial court filed its order dividing the parties' marital estate. Mother worked during the time that Father went to law school, contributing to his earning capacity. The trial court noted, and this Court agrees, that Father is much more capable of obtaining future capital assets; he stipulated that his gross income is $20,000.00 per month. Mother, on the other hand, at the time the trial court divided the marital estate, held a substitute teaching position with an annual salary of $29,000.00 and, though Mother was hopeful, the trial court was uncertain whether she would have the ability to continue on a full-time basis, given that pressure sores had begun to develop after beginning this position. Under the circumstances of this case, we cannot say that the trial court erred in its division of the parties' marital estate.

## Alimony *in Futuro*

Next, Father argues that the trial court erred when it awarded Mother alimony *in futuro* in the amount of $3,500.00 per month. Specifically, Father argues Mother, rather than alimony *in*

---

[2](...continued)
however, the parties could only speculate whether they would be able to collect this money. The trial court determined that if any money were collected from the loan to Lisa Cox, it would be split equally between the parties. Although it is not expressly discussed in the trial court's memorandum opinion or order, the parties in their briefs both state that Mother would receive the $1,500.00 from the outstanding loan to Greg Boyd.

*futuro*, should have received rehabilitative alimony, if any at all. Section 36-5-101(d)[3] states the factors a trial court must consider when it determines the nature and amount of alimony:

(d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

---

[3]    Because the final decree of divorce and the divorce proceedings occurred before Acts 2003, ch. 305, § 2 became effective, amending Tenn. Code Ann. § 36-5-101, the prior version of this statute applies.

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in case where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1) (2001). As it has been noted previously, the real need of the obligee spouse is the single most important factor. *Mitts v. Mitts*, 39 S.W.3d 142, 146 (Tenn. Ct. App. 2000); *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989). Additionally, courts often consider the ability of the obligor spouse to pay support. *Mitts*, 39 S.W.3d at 146; *Cranford*, 772 S.W.2d at 50.

Though Mother appeared to be in good physical and mental health and desired to work full-time, the trial court found that Mother's vocational skills were limited to teaching and she could not be rehabilitated. In the time Mother worked as a substitute teacher, she had already begun to develop a pressure sore from sitting for a longer period than normal. The trial court found, and we agree, that while Mother may be mentally able and willing to teach full-time, she is physically unable to do so given her paralysis. Tenn Code Ann. § 36-5-101(d)(1)(E) (2001). Mother's paralysis is from the chest down. Tenn. Code Ann. § 36-5-101(d)(1)(E) (2001). She experiences pressure sores when she does not lie down throughout the day. Tenn. Code Ann. § 36-5-101(d)(1)(E) (2001). Other than the modest income Mother has earned as a substitute teacher, her only income is her disability income. Tenn. Code Ann. § 36-5-101(d)(1)(A) (2001).

Mother has a college degree, but Father, in addition to a college degree, holds a law degree, to which Mother contributed by working while Father attended law school. Tenn. Code Ann. § 36-5-101(d)(1)(B), (J) (2001). As a result, Father's earning capacity greatly exceeds Mother's ability to earn an income; the parties stipulated that Father has a gross income of $20,000.00 per month. Tenn. Code Ann. § 36-5-101(d)(1)(A) (2001). There is no evidence in the record of any substantial separate property of the parties. Tenn. Code Ann. § 36-5-101(d)(1)(G) (2001). Finally, while alimony is not meant to be punitive, *Kinard v. Kinard*, 986 S.W.2d 220, 224 (Tenn. Ct. App. 1998) (citing *Duncan v. Duncan*, 686 S.W.2d 568, 571 (Tenn. 1984); *McClung v. McClung*, 198 S.W.2d 820, 822 (Tenn. Ct. App. 1946)), it is appropriate to note that the marriage ended through no fault of Mother but rather because of Father's affair with Turnbow. Tenn. Code Ann. § 36-5-101(d)(1)(K) (2001). Under the circumstances of this case, we cannot say that the trial court abused its discretion when it ordered Father to pay alimony *in futuro* in the amount of $3,500.00 per month.

**Attorney's Fees**

In Mother's sole issue on appeal, she asserts that the trial court erred when it denied her request for attorney's fees. In a divorce action, an award of attorney's fees is treated as alimony. *Kinard*, 986 S.W.2d at 235-36 (citing *Smith v. Smith*, 912 S.W.2d 155, 61 (Tenn. Ct. App. 1995); *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988)). As such, trial courts should consider the relevant factors in Tenn. Code Ann. § 36-5-101(d). *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992). The most critical factors to determine whether an award of attorney's fees as alimony *in solido* is appropriate are the need of the disadvantaged spouse and the ability of the obligor spouse to pay. *Bevill v. Bevill*, No. E2004-00190-COA-R3-CV, 2004 Tenn. App. LEXIS 882, at *24 (Tenn. Ct. App. Dec. 30, 2004) (citing *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001) (citing *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989))). In general, these awards are appropriate when the requesting spouse lacks sufficient funds to pay his or her own legal expenses or would be required to deplete his or her resources to pay these expenses. *Brown v. Brown*, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994) (citing *Hougland*, 844 S.W.2d at 623; *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986); *Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980)).

In this case, Mother requested her attorney's fees in her complaint for divorce. After a hearing in September 2002, the trial court decided the issue of which parent would be Sarah's primary residential parent and reserved all other matters for an additional hearing. The trial court held an additional hearing in November 2002 to resolve all remaining issues before the Court. After this hearing, the trial court stated in its memorandum opinion that "[t]his may be a proper case for the payment of attorney's fees. However, there was no evidence introduced at trial of any additional attorney's fees. Mrs. Crowe's claim for attorney's fees, therefore, is denied." In a "motion to reconsider," Mother requests that the trial court revisit the issue of attorney's fees. At a hearing on this motion in September 2003, the trial court stated that "[the Court is] not sure [attorney's fees are] proper,[4] but even if it is proper and [sic] [the Court] will consider the motion. [The Court] is

---

[4]     As previously stated by this Court:

As already noted, [the wife] contends the Trial Court should have considered her post-trial motion wherein she sought to introduce proof justifying an award of an attorney fee. The Trial Court, also as already noted, felt that her motion came too late and denied it. In this we think the Court was in error. It seems to us that the importance of the principal questions to be decided -- which party, if either, is entitled to a divorce, division of property, alimony, custody of children and child support -- should not be diminished by proof regarding the value of attorney's services rendered. Moreover, where one of the criteria for such an award is the results obtained, it should properly be raised after the Court has determined the case and while, of course, the Court still has jurisdiction. We accordingly find the Court should have entertained the motion. We remand the case for the Court to consider the

(continued...)

-13-

considering the motion [for attorney's fees]" The trial court, after considering the motion for attorney's fees, denied Mother's request for Father to pay her legal expenses, given the amount of alimony awarded to Mother, the amount of the equity in the home awarded to Mother, and the amount of child support awarded to Mother.

Mother's attorney, L. L. Harrell, Jr., submitted an affidavit with a copy of Mother's bill attached, listing her current balance at $8,902.70 and noting that Mother previously paid $2,500.00 for a total bill of $11,402.70. Although Mother received enough marital assets and alimony *in futuro* to pay all of these expenses, it would require Mother to deplete the marital assets she has been awarded. *See Koja v. Koja*, 42 S.W.3d 94, 100 (Tenn. Ct. App. 2000). Further, Mother, with her condition of paralysis, is unlikely to be able to earn an income to afford these expenses, and Father, given his far superior earning capacity, has the ability to pay these expenses. *See id.* As such, the two critical factors for determining the appropriateness of an attorney's fee award are met. Under the circumstances of this case, we reverse the order of the trial court denying Mother her request for attorney's fees, and the cause is remanded with instructions to enter an order awarding Mother $5,701.35, representing one-half of Mother's attorney's fees incurred with her attorneys at Harrell & Harrell.

## Mother's Child Support Obligation

Next, Father argues that the trial court erred when it calculated Mother's child support obligation owed to Father to support Jacob.[5] The Tennessee Child Support Guidelines[6] ("Guidelines") are applied as a rebuttable presumption of a parent's child support obligation and if

---

[4](...continued)
matter and, in the exercise of the Court's sound discretion, determine whether an attorney fee should be awarded and if so the amount thereof.

*Pinkard v. Pinkard*, No. 634, 1985 Tenn. App. LEXIS 3156, at *8-9 (Tenn. Ct. App. Sept. 19, 1985) (footnote omitted).

[5] The trial court determined that Father's child support obligation owed to Mother for Sarah was $2,100.00 per month and Mother's child support obligation owed to Father for Jacob was $405.00 per month. As a result, the trial court determined that Father must pay the sum of $1,695.00 in child support to Mother, representing the difference between the two support obligations.

[6] Because this case was heard and adjudicated before the changes to the Guidelines effective on January 18, 2005, reference will be made to the Guidelines in existence at the time the trial court determined Mother's child support obligation.

a trial court determines there is evidence to rebut this presumption, it must make a written finding that application of the Guidelines would be "unjust or inappropriate in that particular case in order to provide for the best interest of the child or the equity between the parties and the court must show what the child support award would have been without the deviation." Tenn. Comp. R. & Regs. 1240-2-4-.01(2003). The trial court determined that Mother's child support obligation to Father for Jacob would be $405.00 per month based on gross monthly earnings of $2,416.00. This amount of gross income appears to be based on Mother's testimony regarding her temporary employment as a substitute teacher. However, such amount does not appear to include the amount of alimony received by Mother each month, *see* Tenn. Comp. R. & Regs. 1240-2-4-.03(3)(a) (2003) (stating that "gross income" for purposes of the Guidelines includes "alimony or maintenance"); *see also West v. West*, No. E2004-00422-COA-R3-CV, 2004 Tenn. App. LEXIS 809, at *12 (Tenn. Ct. App. Nov. 30, 2004), nor does it appear to include the $1,265.00 Mother receives in disability income from the Social Security Administration. *See* Tenn. Comp. R. & Regs. 1240-2-4-.03(a) (2003) (stating that "gross income" for purposes of the Guidelines includes "benefits received from the Social Security Administration" but does not include Supplemental Security Income). Therefore, we reverse the trial court's determination of Mother's child support obligation because it does not appear to include all sources of income as defined in the Child Support Guidelines.

## Conclusion

For the reasons stated above, we affirm the trial court's decision naming Lorrie L. Crowe the primary residential parent of the parties' daughter, Sarah. We affirm the trial court's marital property division and its award of alimony *in futuro* to Lorrie L. Crowe. We reverse the trial court's determination of Lorrie L. Crowe's child support obligation and remand for further proceedings to properly calculate her obligation in accordance with the Child Support Guidelines. We reverse the trial court's denial of Lorrie L. Crowe's request for attorney's fees and remand this cause for entry of an order awarding Lorrie L. Crowe $5,701.35 in attorney's fees. Costs of this appeal are taxed equally to Appellant/Cross-Appellee, Lorrie L. Crowe, and Appellee/Cross-Appellant, Kyle E. Crowe, and their surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, JUDGE